Steve A. Miller (CA Bar No. 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

Jonathan E. Fortman (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax:  (314) 524-1519
Email:  jef@fortmanlaw.com

John C. Kress (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO  63111
Ph.#:  (314) 631-3883
Fax:  (314) 332-1534
Email:  jckress@thekresslawfirm.com

Maureen Connors (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
Phone: (216) 640-9860
Fax: (216) 504-4049
Email: maureenconnors@maureenconnorslaw.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMANTHA ELLISON, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff<br><br>v.<br><br>STEVE MADDEN, LTD., a Delaware corporation,<br><br>Defendant | CV-11-05935 PSG-AGR<br><br>Hon. Phillip S. Gutierrez<br><br>**OBJECTIONS TO SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND NOTICE OF INTENT TO APPEAR** |

1         COMES NOW class members[1], **Aileen Connors**, 785 Timberline Trail, Sagamore Hills,

2 Ohio 44067, telephone number on which text messages were received 216-392-3070, and

3 **Constance Giratos**, 624 Timberidge Drive, St. Charles, MO 63303, telephone number on which

4 text messages were received is (314) 280-3769 by and through their attorneys, and hereby files

5 their Objections to Settlement and Award of Attorneys' Fees, with their signatures attached hereto

6 and who intend to appear at the fairness hearing through counsel of record, objecting to this

7 settlement and application for attorneys' fees by Settlement Counsel for the following reasons:

8

9        **I.**     **The percentage of the common fund requested as Attorneys' Fees**
**is excessive in contrast to the actual work performed, relief obtained, benefit provided to the**
10 **Class and the actual claims paid, resulting in a windfall to Settlement Counsel that is not**
**supported by Law.**
11

12        After only eight months of litigation, Class Counsel and Defendant Counsel began

13 mediation to settle this case in what looks like a near record time. While Class Counsel claim that

14 more than 300 gigabytes of electronically stored information was produced by Defendant, they

15 make no allegation that the 300 gigs of data provided was relevant to Defendant's *Telephone*

16 *Consumer Protection Act* 47 U.S.C. § 227 violation (hereafter "*TCPA*"). While 300 gig seems

17 like it would amount to a massive amount of data, the amount turned over in discovery is

18 completely irrelevant if it was not useful or pertinent data nor if it was not actually used in

19 litigation. Counsel attempts to argue and convince this Court and their class members that that

20 such quick litigation justifies 25% of the common fund, calculated by Settlement Counsel to be a

21 fee award of 2. 5 Million Dollars. Class Counsel brags that "the Parties reached the Agreement

22 *only after engaging in several rounds* of arm's-length negotiations." (Emphasis added.) (See Class

23 Counsel's Renewed Motion for Award of Attorneys' Fees Introduction, Page 5, line 1.) Further

24 they add "What makes this fee request all the more reasonable is the fact that Class Counsel was

25 able to achieve this result expeditiously, resulting in quick relief to Class Members and preserving

26

27

28   [1] All persons nationwide who from July 2010 until September 25, 2012 were sent any text message promoting Steve Madden products and events from short codes 91919 or 623336.

1  judicial resources." (See Class Counsel's Renewed Motion for Award of Attorneys' Fees

2  Introduction, Page 2, line 15-18.)  The fact that the settlement was obtained so expeditiously, as

3  Class Counsel alleges, would be better described as hastily or rushed.   Initial disclosures were to

4  be exchanged on September 7, 2011 per the Joint Rule 26(f) Report filed on September 6, 2011.

5  Suffice it to say, only after eight short months of litigation, the Parties met for mediation on May

6  8, 2012 and moved to stay litigation on May 15, 2012, including discovery and pending Motions.

7  Not only were they already negotiating after only eight months of "litigation", the Settlement

8  Agreement was finalized and signed by the parties on July 30, 2012, less than three months of

9  negotiating.

10       Indeed, adversarial proceedings of any sort are completely absent.  No motions to dismiss.

11  No summary judgment.  Even the discovery was "friendly" or conducted without necessity of

12  compelling production of the alleged information that led to the proposed settlement.  It is difficult

13  to fathom justification for the fees sought by counsel under such benign circumstances.

14       The actual value of the settlement to class members is significantly lower than Class

15  Counsel would lead this Court and members to believe.  A close read of the settlement and FAQs

16  reveals that the settlement is up to ten million less attorney fees of 2.5 million (which may or may

17  not be 25% of perspective relief), less the Class Representative incentive award of $10,000, and

18  less all costs which include direct mailing, magazine ads in Cosmopolitan and People, internet

19  publication, and internet advertising (Settlement Agreement, Doc. #41-1, p. 14, par 4.2 d).  The

20  only expense actually defined is the internet advertising of up to $54,000 (Stlmt Agreement, Doc.

21  #41-1, p. 14, par 4.2 e).  The amount of funds that may be actually available to the members for

22  claims is completely unknown.  It is disingenuous on the part of Class Counsel to claim that

23  203,254 members could possibly receive up to $150 per member (Stlmt Agrmt, Doc. #41-1, p. 13,

24  par 4.2 a and p. 11, par 2.1 a).  In order for each member to receive anywhere near the alleged

1   $150, the settlement would have to be in excess of **38 million dollars**[2], not 10 million, to pay all

2   of the known expenses.  38 million dollars does not even take into consideration the expenses not

3   assigned a dollar amount in the Settlement Agreement.  How much more would the settlement

4   need to be to get to $150 per claim?  We cannot even speculate.

5        Further, the actual value of the settlement to class members is illusory, and significantly

6   lower than Class Counsel would lead this Court and members to believe because the class fund is

7   *up to ten million dollars*.  Paragraph 1.35 defines that initially 5 million dollars will be paid into

8   the fund and if and when the balance falls below 1 million, Defendant will replenish it in

9   increments of 1 million dollars.  Out of that first 5 million dollars, Class Counsel shall receive

10   their attorney fees (2.5 million agreed amount per Class Counsel's Motion for Attorneys' Fees

11   filed January 2, 2013) and all other expenses shall be paid (again, amount unknown but it is at

12   least the cost of internet advertising of $54,000 and the incentive award of $10,000).  The *Pocket*

13   *Guide* warns courts to be wary of settlements for which the court cannot effectively give a dollar

14   value. *(downloadable from the internet at* http://www.uscourts.gov*)*

15
16
17        Your appraisal of the settlement should focus on the value _actually distributed_ to the
        class—based on the number and percentage of class members who have filed a
18        claim… making the stated value of the settlement fund illusory. Because there is no
        clear standard for predicting class response rates, consider calculating any attorney fee
19        award as a percentage of the amount of the settlement fund that has already been
        distributed to the claimants—_even if that means deferring final determination_ of all or
20        part of the fee award until the claims process is complete.
        *Pocket Guide, Section B. 5, p. 6. Appraisal of settlement 2010 ed.*  (Emphasis added.)

21

22        Class Counsel has essentially been given a guaranteed pay-out of 2.5 Million Dollars, and

23   the Defendant is only obligated to put up, or post 2.5 Million Dollars to fund claims.  And if no

24   other claims are filed that exceed the fund . . . then Defendant is not obligated to pay anything

25   (Stlmt Agrment, Doc. #41-1, p. 12, par. 1.35) ("The Settlement Fund represents the limit and

26   extent of Defendant's monetary obligations under this Agreement. In no event shall Defendant's

27

28   [2] 203,254 members x $150 per member + 25% attorneys' fees requested + $64,000 costs and incentives = $38,174,125

total financial liability exceed ten million dollars ($10,000,000.00) plus the interest earned on the Settlement Fund"). Here, the actual "fund" created is only 5 Million Dollars, making the fees sought in this case equal to 50% of the fund-an unconscionable windfall that cannot be allowed by this Court.

Indeed, the class members are misled as to the true value of the settlement, and the Defendants are guaranteed a reverter of the funds (Stlmt Agrmt, Doc. #41-1, p. 12, par. 2.1(b) ("The remaining funds are the property of the Defendant. In no event will the Remaining Funds constitute abandoned or unclaimed property, and the Defendant is entitled to all such Remaining Funds."). The Pocket Guide discourages the approval of settlements where a reversion is present. The *Pocket Guide* warns the court that reversion of unclaimed funds is a "hot button indicator" that the settlement is unfair because it allows for "class counsel and defendant to use the artificially inflated settlement amount as a basis for attorney fees". An imbalance between the cash value of the settlement to the class as a whole and the agreed amount of attorneys fees is a prime indicator of collusion by settling attorneys." *Pocket Guide, p. 19-20 at 4. Restriction on Claims/reversion of unclaimed funds to defendants 2010 ed.* The *Pocket Guide* actually suggests that instead of returning funds to the defendant, the balance of funds be distributed to the members that did submit claims.

Nor is the Defendant obligated to pay out more than 2.5 Million Dollars to the class members. Apparently, additional funds are paid only in 1 Million Dollar increments "any time the Settlement Fund shall fall to a balance of or below one million dollars ($1,000,000.00) (Stlmt Agrmt, Doc #41-1, p. 10, par. 1.35). The true value of the settlement, at best- is only 2.5 Million Dollars, and not 10 Million Dollars. Simple arithmetic employed in a straight forward manner reveals that this settlement is not about providing relief to the class, but providing fees to the attorneys in exchange for eviscerating the claims of the class members.

1      Paragraph 2.1C indicates that after 60 days the Effective Date, which is 10 days after the

2  Final Judgment or Alternative Judgment, the Settlement Administrator shall pay all Approved

3  Claims by check which must be presented within 90 days of issuances (Stlmt Agrmt, Doc. #41-1,

4  p. 11, par. 2.1 c).  After 180 days from the Effective Date, the Settlement Administrator shall pay

5  to Defendant all remaining money in the fund.  What is the practical meaning of this scenario?  It

6  means that all claims will be paid within 90 days of the effective date, the first checks being

7  written within 60 days of the Effective Date, and the remaining to be paid in the next 30 days to

8  accommodate the 90 day deadline to present the claim's check.  Only time will tell as to how

9  many claims will be submitted by the claims bar date of April 11, 2013.

10      Based on this scenario, two things are for certain. First, if all eligible members submit their

11  claims, the members will get far less than the $150.00.  Second, if far fewer than the 203,254

12  members submit claims so that the members actually get their $150.00, the Defendant gets the

13  money back!  Rather than leave the fund open for other members to submit their claims, extending

14  the deadline or doing a second round of notice the sham fund is actually returned to the offenders.

15  These examples of leaving the fund open longer, extending the deadline, or re-noticing the

16  members, would actually benefit the class members and ensure that they actually receive the

17  benefit of the settlement.

18      Or rather than force the members to file a claim, how about just mail checks to the same

19  address that notice was mailed to? A Class List exists; the Parties know who the members are.

20  (See Declaration of Cameron Azari, Paragraph 8.)  If any of the notice cards came back in the mail

21  as not deliverable, those addresses could be removed from the database before the checks were

22  sent.  Or just mail the checks and if they are returned it has only costs the 45 cents to mail it and

23  the pennies to print the check, which is an expense that would be there anyway if the member did

24  submit a claim.  Other options available would be to actually look at how many members received

more than one text message creating subgroups to be awarded different amount depending on the number of text messages received. There are far more creative ways to put these funds into the hands of the members than back in the pockets of the Defendant. What if only a million or two million dollars of claims actually are submitted? It means that Class Counsel has already received their funds, up to 2.5 million, and that their attorney fees could potentially equal or exceed the benefit to the class.

The *Pocket Guide* warns the court that collusion / "reverse auctions" is a "hot button indicator" that the settlement is unfair when their exists "An imbalance between the cash value of the settlement to the class as a whole and the agreed amount of attorneys fees is a prime indicator of collusion by settling attorneys." *Pocket Guide, p. 20 at 5. Collusion: "Reverse Auctions" and the like." 2010 ed.*

The *Pocket Guide* warns the judiciary to be vigilant to Class Counsel that seeks fees for what is nothing more than settlement of the case at hand, evidencing collusion or a "Reverse Auction" among the parties:

> A typical element of a reverse auction is a promise to pay attorneys more than a reasonable value for the time they invested in negotiating the settlement. Generally, the overpayment of the attorneys originates in an underpayment of what the class should receive based on an objective assessment of the merits of the class claims. *(Pocket Guide, p. 21, 2010 ed)*.

Settlement Counsel has already conceded that the majority of the "work" performed occurred during settlement, or while negotiating settlement. This is a "clear sailing" arrangement that "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Lobatz v. U.S. Cellular of Cal., Inc. 222 F.3d 1142, 1148 (9th Cir. 2000)*.

Here, the class as a whole could be receiving a very small monetary benefit, or in the alternative a few could be receiving the actually advertised amount. Regardless of the actual

1  benefit the members receive individually and regardless of the actual total amount of the fund

2  available to members, Class Counsel receives a windfall, up to 2.5 million. This is prohibited.

3       It is proper for courts to review the actual claims made and the amount paid before

4  calculating an attorney's fee award. *Schwartz . Dallas Cowboys Football Club, Ltd.*, 157 F. Supp.

5  *2d 561 (E.D. Pa. 2001); accord, Sylvester v. CIGNA Corp.*, 369 F.Supp. 2d 34, 50-53 (D. Me.

6

7  *2005).*

8       Under the circumstances described above, Settlement Counsel should not be compensated

9  for work they performed that is related only to settlement of the case. As such Settlement Counsel

10 is entitled to a nominal fee, in line with the nominal work performed on behalf of the class that

11 directly relates to the economic relief provided to the class.

12

13      Counsel argues that "the current, prevailing view of …the Ninth Circuit, is that the

14 percentage-of-recovery method should be used when, as here, a common fund is created for the

15 benefit of a class. *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008)

16 (citing *Chem. Bank v. City of Seattle*, 19 F.3d 1291, 1296 (9th Cir. 2004)); see also *In re*

17 *Activision*, 723 F. Supp. at 1375-78 (collecting authorities)." In the case at hand, while this

18 argument seems clear on its face, its true meaning is clouded. Counsel is asking for 2.5 million

19 dollars which is alleges is up to 25% of the class fund but this is misleading. As detailed above,

20

21 unused and remain funds will be returned to Defendant after the claims are paid. And the only

22 fund obligated to be created by Defendant is for 5 Million Dollars- not the 10 Million represented

23 to this Court and the class members. This Court will not be able to ascertain what the percentage is

24 if Class Counsel is awarded 2.5 million now before the claims are actually paid. But according to

25 the parties own agreement, it appears that Class Counsel is receiving 50% of the "settlement fund"

26 of 5 Million Dollars.

27

28      Further, counsel states that "the percentage-of-fund method has the benefits of eliminating

the incentive to unnecessarily "run-up" billable hours, encouraging early settlement of disputes, and preserving judicial resources otherwise used monitoring attorneys' billable hours. *In re Activision*, 723 F. Supp. at 1376." Quite the contrary in this case; by counsels own words, they deserve this high of an attorneys' fees award because of their expeditious result. (See Class Counsel's Renewed Motion for Award of Attorneys' Fees Introduction, Page 2, line 15-18.) If counsel thinks that they deserve 50% of the potential 5 Million Dollar settlement because they were so expeditious in getting the case settle rather than others who "unnecessarily 'run-up' billing, then why the need for the crosschecking with Lodestar? (See Class Counsel's Renewed Motion for Award of Attorneys' Fees Section III D, Page 17, line 1.) Moreover, why misrepresent the actual amount contained within the Settlement Fund? Class Counsel's actual billable time is valued at $648,612.50 total. They ask that this Court use a multiplier of 3.8 without any explanation of why that figure should be used. No multiplier is appropriate under these circumstances.

While claiming that the majority of Ninth Circuit cases use between 1.5 and 3, citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 at 1051 n.6 and Appendix (9th Cir. 2002), they conveniently assign themselves 3.8 to justify 2.5 Million in fees. The average multiplier of the cases reviewed in *Vizcaino* is actually 2.34 *however* three cases actual skew the average because one case used 19.6, another was a range up to 8.5, and another 6.2. If you remove just the 19.6 the average is actually 1.9, a more reasonable multiplier. Furthermore, in the 34 cases the court reviewed in *Vizcaino*, 10 out of the 34 received no multiplier.

**II.     The proposed relief provided to the class, up to $150.00 per member is inadequate.**

Even if a limited number of members file claims and those members do receive $150 per claim, that amount is wholly inadequate. Plaintiff, on behalf of herself and a nationwide class of similarly situated individuals, brought suit under the Telecommunications Privacy Act Act, 47

U.S.C. § 227, et seq. ("47 U.S.C. § 227"), which prohibits unsolicited voice and text calls to cell phones.  Plaintiff sought an injunction requiring Defendant to cease all wireless spam activities and an award of *statutory damages* to the class members.  Class counsel pats themselves on the back by calling up to $150 *"exceptional"* in their attorneys' fees motion. (See Class Counsel's Renewed Motion for Award of Attorneys' Fees Section III C 2, Page 12, line 25.)  While counsel claims that this is a "substantial monetary benefit", they must have forgot to re-read their Complaint which seeks *statutory damages* to the class members prior to negotiating a settlement. (See Class Counsel's Renewed Motion for Award of Attorneys' Fees Section III C 2, Page 13, line 19.)  Claiming that the benefit obtained, which at best is 10% (and probably a whole lot less) of the amount prescribed by statute is simply pure folly.  *TCPA* 47 USC 227 (b)(3) provides for $1,500 per willfull offense.

Quite frankly, Defendants are getting off easy if they only pay 2.5 million dollars as their penalty, based upon the proposed settlement offered by the parties.  If litigated to its ultimate conclusion as imposed by the Commission, the damages could exceed 2 Billion Dollars civilly plus 2 Billion Dollars criminally per 47 USC  227 (e)(5)(A) and (B).  Class Counsel's meager 7.5 Million Dollars (of which only 2.5 Million is actually committed to a settlement fund for the benefit of the class members) is far from "exceptional" or "substantial". Rather than seeking damages and a member award that would actually have been in line with statute, Class Counsel sought to end this case "expeditiously".

What is exceptional, and substantial is the windfall of attorney's fees sought of 50% of the common fund Defendant agreed to pay.

**III.     The proposed settlement is unfair as it fails to provide adequate injunctive relief for which this Court can assess a value to the class members, and cannot be the basis for an application of attorney's fees.**

In addition to statutory damages, Plaintiff sought an injunction requiring Defendant to

cease *all wireless spam activities* to the class members. Such injunctive relief would be welcomed by the class members. However, after the smoke has cleared away from class counsel's "litigation", the best class counsel could do other than line their own pockets and return the balance of funds unused to the Defendant, was create an injunction that provides that Defendants will not violate the law – the law that they are supposed to not be violating to begin with – for four years. Injunctive relief can benefit the class, but in this case, its benefit is negligible.

Injunctive relief provided to the class is another "hot button indicator" according to the *Pocket Guide* and requires scrutiny by this Court:

6. Injunctive relief

Question whether injunctive relief will truly benefit class members in the case at hand. In many cases, by putting an end to illegal practices, an injunction will benefit more class members than a small award. It will also avoid clogging the judicial system with the administration of small awards to thousands of class members. But it is important to press the parties to identify such cases clearly and justify the remedy and fees. Ask yourself—and perhaps the parties—the following questions:

• How much is the injunction worth to the class as a practical matter?

• What is the dollar value the relief might yield?

• What is the real cost to the defendant?

• Does the injunctive relief do more than restate the obligation that the defendant already has under existing law or under a decree entered by a regulatory body?

• Are there viable damage claims that class counsel has not pursued?

• Might an emphasis on injunctive relief and proposed certifi - cation of a Rule 23(b)(2) class amount to a tactical move to avoid more stringent certification requirements and opt-out rights associated with a damages class under Rule 23(b)(3)? Consider whether you need independent expert advice to place a value on the relief offered, as discussed below in part VII.

(*Pocket Guide*, 3d ed., p. 21-22). The Ninth Circuit Court of Appeals holds that "parties ordinarily

1    may not include an estimated value of undifferentiated injunctive relief in the amount of an actual

2    or putative common fund for purposes of determining an award of attorney's fees. *Staton v. Boeing*

3    *Co., 327 F.3d 938, 946 (9th Cir., 2003).*

4
5        The injunctive relief is conditional upon the approval of the settlement. Defendant should

6    have stopped sending unsolicited texts immediately upon this suit being brought or once they were

7    aware that their actions violated law, not "on or before the Effective Date" as detailed in the

8    Settlement Agreement Paragraph 2.2. Further, the relief is not permanent, lasting only four (4)

9    years.   The parties have manipulated the injunctive relief making it ineffectual, and not lasting

10   for the class members. Plaintiff's goal of seeking an injunction requiring Defendant to cease *all*

11   *wireless spam activities* to the class members becomes nothing more than rhetoric.   Under the

12   analysis of the *Pocket Guide*, and *Staton*, the injunctive relief has a zero value, since it does

13   nothing more than reestablish the status quo for the Defendant, merely restating its legal

14   obligations and allows it to completely avoid following the law after four years.

15
16       According to the Court of Appeals, it is "precisely because the value of injunctive relief is

17   difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to

18   increase the value assigned to the common fund. *Id.* at 974.  Despite such paucity of injunctive

19   relief, class counsel boldly claims this is a good result for the class members, justifying its fee of

20   2. 5 Million Dollars.

21
22       But this Court of Appeals also holds "that only in the unusual circumstance where the

23   value to individual class members of benefits deriving from injunctive relief can be accurately

24   ascertained may courts include such relief as part of the value of a common fund for purposes of

25   applying the percentage method of determining fees." *Id.*   When "this is not the case, courts

26   should consider the value of the injunctive relief obtained as a "relevant circumstance" in

27   determining what percentage of the common fund class counsel should receive as attorneys' fees,

28

rather than as part of the fund itself." *Id.*  Here, class counsels' fee request of 25% of the contingent common fund should be reduced to the value of the injunctive relief sought, somewhere in the reasonable amount of 5% of the fund, since the injunctive relief is not meaningful.

Where "obtaining injunctive relief likely accounted for a significant part of the fees expended, courts can use the common fund version of the lodestar method either to set the fee award or as a cross-check to assist in the determination of how the "relevant circumstance" of the injunctive relief should affect a percentage award. *Id.*

The problem for class counsel is that it is impossible to quantify a value of 2.5 Million Dollars as members will be receiving such little benefit, not getting what they are statutorily entitled to and a promise to not break the law for four years.

WHEREFORE, Objectors hereby pray that this Court deny the Settlement proposal entered into between the parties and enter the following additional relief:

(1) An Order overruling Settlement Counsels' application for attorney's fees of 2.5 Million Dollars;

(2) An Order withholding the calculation of the attorney's fees until this Court makes a determination of the number of claims actually submitted and paid, and the value of each claim;

(3) An Order denying the valuation of the injunctive relief as proposed by the parties as part of the value of the settlement to the class members and as a basis for an award of attorney's fees;

(4) An Order denying the application of a multiplier against the alleged lodestar of class counsel;

1     (5)   Any further relief necessary within the premises based upon the objections set forth above

2     and herein.

3     Respectfully submitted by attorneys for Objectors above named:

4            s/Steve A. Miller

5            Steve A. Miller (CA Bar No. 171815)

           Steve A. Miller, PC

6            1625 Larimer Street, No. 2905

           Denver, CO 80202

7            Ph# 303-892-9933

           Fax: 303-892-8925

8            Email: sampc01@gmail.com

9

           Jonathan E. Fortman (40319MO)

10           Law Office of Jonathan E. Fortman, LLC

           10 Strecker Rd., Suite 1150

11           Ellisville, MO 63011

           Ph# (314) 522-2312

12           Fax: (314) 524-1519

           Email: jef@fortmanlaw.com

13

14           John C. Kress (53396MO)

           The Kress Law Firm, LLC

15           4247 S. Grand Blvd

           St. Louis, MO 63111

16           Ph.#: (314) 631-3883

           Fax: (314) 332-1534

17           Email: jckress@thekresslawfirm.com

18

19           Maureen Connors (0074094OH)

           Maureen Connors, Attorney at Law

20           6625 Pearl Road

           Parma Heights, Ohio 44130

21           Ph.#: (216) 640-9860

           Fax: (216) 504-4049

22           Email: maureenconnors@maureenconnorslaw.com

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of January, 2013, I have filed and served via ECF Filing using the USDC SD CA ECF Electronic Filing System a true and correct copy of the foregoing and in addition have mailed a copy via U.S.P.S. First Class Postage Prepaid to the following:

Jay Edelson
Edelson McGuire, LLC
350 North LaSalle Street Suite 1300
Chicago, IL 60654
Class Counsel

David S. Eisen
Wilson Elser Moskowitz
Edelman & Dicker LLP
555 South Flower Street
Suite 2900
Los Angeles, CA 90071
Attorneys for Defendant

s/Steve A. Miller

I, Aileen Connors, object to the Steve Madden settlement and consent to the filing of the objection by my attorneys on my behalf.

*Aileen Connors*

My name is Constance Giratos, and I object to this settlement for the reasons set forth in the attached objection.

Constance Giratos