1  Suzanne Havens Beckman (SBN 188814)
   shavens@parisihavens.com
2  David C. Parisi
   dcparisi@parisihavens.com
3  PARISI & HAVENS LLP
4  15233 Valleyheart Drive
5  Sherman Oaks, CA 91403
   Telephone: (818) 990-1299
6  Facsimile: (818) 501-7852

7  Ryan D. Andrews (*Pro Hac Vice*)
8  randrews@edelson.com
   Ari J. Scharg (*Pro Hac Vice*)
9  ascharg@edelson.com
10 John C. Ochoa (*Pro Hac Vice*)
   jochoa@edelson.com
11 EDELSON MCGUIRE LLC
12 350 North LaSalle, Suite 1300
   Chicago, IL 60654
13 Telephone: (312) 589-6370
14 Facsimile: (312) 589-6378

15 *Attorneys for Plaintiff*

16        **IN THE UNITED STATES DISTRICT COURT**

17      **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

18 SAMANTHA ELLISON, individually      )   CV-11-05935 PSG-AGR
19 and on behalf of a class of similarly )
   situated individuals,                )   **PLAINTIFF'S NOTICE OF**
20                                       )   **MOTION AND MOTION FOR**
21                 Plaintiff,            )   **FINAL APPROVAL OF CLASS**
                                         )   **ACTION SETTLEMENT**
22 v.                                    )
                                         )   **Date: February 25, 2013**
23                                       )   **Time: 1:30 p.m.**
24 STEVEN MADDEN, LTD., a                )   ***Hearing date and time authorized***
   Delaware corporation,                 )   ***by the Court's September 28, 2012***
25                                       )   ***Order (Dkt. 48)***
                  Defendant,             )
26                                       )   Hon. Philip S. Gutierrez
27 _____ )

# NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that Plaintiff will move the Court, pursuant to Federal Rule of Civil Procedure 23(e) and this Court's Orders of September 25, 2012 (Dkt. 45) and September 28, 2012 (Dkt. 48), to grant Plaintiff's Motion for Final Approval of Class Action Settlement on February 25, 2013 at 1:30 p.m., or at such other time as may be set by the Court, at 255 East Temple Street, Los Angeles, California, 90012, Courtroom 880, before the Honorable Philip S. Gutierrez.

Class Counsel respectfully requests that this Court grant its Motion for Final Approval of Class Action Settlement.  The Motion is based on this Notice of Motion, the Brief in Support of the Motion attached hereto and the authorities cited therein, Plaintiff's Confidential Memorandum submitted to this Court per the Court's September 28, 2012 Order (dkt. 48), Plaintiff's Response to the Objections of Constance Giratos and Aileen Connors, Plaintiff's Motion for Attorney Fees and Incentive Award (dkt. 52), oral argument of counsel, and any other matter that may be submitted at the hearing.

Dated: January 25, 2013                    Respectfully Submitted,

                                           SAMANTHA ELLISON, individually and
                                           on behalf of a class of similarly situated
                                           individuals,

                                           /s/    Ari J. Scharg
                                           One of Plaintiff's Attorneys

                                           Suzanne Havens Beckman (SBN 188814)
                                           shavens@parisihavens.com
                                           David C. Parisi
                                           dcparisi@parisihavens.com
                                           PARISI & HAVENS LLP
                                           15233 Valleyheart Drive

Sherman Oaks, CA 91403
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Ryan D. Andrews (*Pro Hac Vice*)
randrews@edelson.com
Ari J. Scharg (*Pro Hac Vice*)
ascharg@edelson.com
John C. Ochoa (*Pro Hac Vice*)
jochoa@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

## **Table of Contents**

I.   **INTRODUCTION** ......................................................... 1

II.  **THE FACTS, THE LAW, AND THE LITIGATION HISTORY** ........... 3

III. **TERMS OF THE SETTLEMENT AGREEMENT** ..................... 5

    A.   **Class Definition** ................................................. 5

    B.   **Individual Class Member Relief** ........................... 5

    C.   **Prospective Relief** ............................................. 5

        *1.   Obtaining Prior Express Consent* .................... 6

        *2.   Proof of Consent* ..................................... 6

        *3.   Third-Party Agreements* .............................. 6

        *4.   Prohibition on Future Text Messages* ................ 6

    D.   **Other Relief** ................................................... 6

        *1.   Payment of Notice and Administrative Fees* ......... 6

        *2.   Compensation for the Class Representative* ......... 7

        *3.   Payment of Attorneys' Fees and Expenses* .......... 7

    E.   **Release** ......................................................... 7

IV.  **THE NOTICE PLAN COMPORTS WITH DUE PROCESS** ........ 8

V.   **THE SETTLEMENT WARRANTS FINAL APPROVAL** ......... 10

    A.   **The Strength of Plaintiff's Case** ......................... 12

    B.   **The Risk of Continued Litigation** ....................... 15

    C.   **The Risk of Maintaining Class Action Status** ........ 16

    D.   **The Amount Offered in Settlement** ..................... 17

    E.   **The Extent of Discovery and Stage of Litigation** ..... 19

    F.   **The Experience and Views of Counsel** ................. 20

    G.   **The Presence of a Governmental Participant** ......... 21

    H.   **The Reaction of Class Members to Date** .............. 21

    I.   **There Was No Collusion Between the Parties in Reaching the Settlement** ................................................... 22

1

**VI.    CONCLUSION** ........................................................................................ 24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>United States Supreme Court Cases:</u>**

3

*BMW of N. Am., Inc. v. Gore,*
   517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)................................ 18

4

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,*
   532 U.S. 424, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001)............................... 18

5

6

*Eisen v. Carlisle & Jacquelin,*
   417 U.S. 156, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974) ................................. 8

7

8

*Evans v. Jeff D.,*
   475 U.S. 717, 106 S. Ct. 1531, 89 L. Ed. 2d 747 (1986); .................................. 8

9

*Mims v. Arrow Fin. Servs. LLC,*
   132 S. Ct. 740, 181 L. Ed. 2d 881 (2012)........................................................ 4

10

*Protective Comm. for Indep. Stockholders v. Anderson,*
   390 U.S. 414, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968) .......................................... 12

11

12

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) .............................................. 16

13

**<u>United States Circuit Court of Appeals Cases:</u>**

14

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ................. 10, 22

15

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .......................... 10

16

*Gene and Gene, LLC v. Biopay LLC,* 541 F.3d 318 (5th Cir. 2008) ..................... 14

17

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998) ........................ 10, 17, 22

18

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) .............................................................. 22, 23, 24

19

20

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)............... 15, 19, 22

21

*In re Pac. Enters. Sec. Litig.,* 47 F.3d 373 (9th Cir. 1995) ......................................20

22

*Lane v. Facebook, Inc.,* 696 F.3d 811 (9th Cir. 2012)............................ 10, 17, 18

23

*Linney v. Cellular Alaska P'ship,* 151 F.3d 1234 (9th Cir.1998) ......................... 19

24

*Malchman v. Davis*, 761 F.2d 893 (2nd Cir.1985) ............................................. 23

25

*Mendoza v. Tucson Sch. Dist. No. 1,* 623 F.2d 1338 (9th Cir.1980) ...................... 8

26

*Officers for Justice v. Civil Serv. Comm'n of City and County of*
   *San Francisco,* 688 F.2d 615 (9th Cir. 1982)........................................... *passim*

27

28

*Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13 (2d Cir. 2003) .................. 18

*Powers v. Elchen,* 229 F.3d 1249 (9th Cir. 2000) ................................................. 23

*Rodriguez v. West Publ'g Corp.,* 563 F.3d 948 (9th Cir. 2009) ..................... *passim*

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ................. 4, 20

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .............................................. 23

**United States District Court Cases:**

*Agne v. Papa John's Int'l, Inc.,*
--- F.R.D. ----, 2012 WL 5473719 (W.D. Wash. Nov. 9, 2012)................. 13, 16

*Bellows v. NCO Fin. Sys., Inc.,* No. 07-CV-01413-W-AJB,
2008 WL 5458986 (S.D. Cal. Dec. 10, 2008) ............................................. 14, 19

*Blanco v. CEC Entm't Concepts L.P.,*
No. 07-cv-0559 GPS, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008) ................. 18

*Bridgeview Heath Care Ctr. Ltd. v. Clark,*
No. 09-cv-05601, 2011 WL 4585028 (N.D. Ill. Sept. 30, 2011) .................... 13

*Espinal v. Burger King, Corp.*, No. 09-cv-20982 (S.D. Fla.)................................... 3

*Gardner v. GC Servs., LP,* No. 10-CV-0997-IEG CAB,
2012 WL 1119534 (S.D. Cal. Apr. 2, 2012) ............................................. 16, 19

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)............................................ 11, 12

*Green v. DirecTv, Inc.,*
No. 10-cv-117, 2010 WL 4628734 (N.D. Ill. Nov. 8, 2010)............................ 13

*Griffith v. Consumer Portfolio Serv., Inc.,*
838 F. Supp. 2d 723 (N.D. Ill. 2011)................................................................ 13

*Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011) ............................... 22, 23

*In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal. 2010) ................... 20-21

*In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX,
2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ................................................. 24

*In re Jiffy Lube Intern., Inc., Text Spam Litig.,*
847 F. Supp. 2d 1253 (S.D. Cal. 2012) ........................................................... 13

*In re Omnivision Tech., Inc.,*
559 F. Supp. 2d 1036 (N.D. Cal. 2008)....................................................... 15, 19

*In re Warner Comm'ns Sec. Litig.,*
618 F. Supp. 735 (S.D.N.Y. 1985) ................................................................... 19

*Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162 (S.D. Ind. 1997)...................... 17

*Kramer v. Autobytel, Inc. et al.*,
  No. 10-cv-2722 CW (N.D. Cal. Jan. 27, 2012) ................................... 3

*Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010) ...................... 4

*Lozano v. Twentieth Century Fox*, No. 09-cv-6344 (N.D. Ill. 2011)....................... 3

*Martin v. AmeriPride Servs., Inc.*, No. 08-CV-440-MMA JMA,
  2011 WL 2313604 (S.D. Cal. June 9, 2011) ................................ 11, 17, 20, 22

*McKinnie v. JP Morgan Chase Bank, N.A.*,
  678 F. Supp. 2d 806 (E.D. Wis. 2009) ........................................... 23

*Nabal v. BJ's Wholesale Club, Inc.*,
  No. 02-CV-2604, 2002 WL 32349137 (E.D. Pa. Aug. 2, 2002) ...................... 23

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004)............................................... *passim*

*Rojas v. Career Education Corp.*,
  No. 10-cv-5260 (N.D. Ill. 2012) ................................................. 3

*Romero v. Producers Dairy Foods, Inc.*,
  No. 05-cv-0484, 2007 WL 3492841 (E.C. Cal. Nov. 14, 2007) ...................... 11

*Satterfield v. Simon & Schuster, Inc. et al.*,
  No. 06-cv-02893-CW (N.D. Cal.) ................................................. 3

*Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC,
  2012 WL 5392159 (S.D. Cal. Nov. 5, 2012)................................. 12, 15

*Thomas v. Taco Bell Corp.*,
  --- F. Supp. 2d ----, 2012 WL 3047351 (C.D. Cal. June 25, 2012) .................. 13

*Weinstein v. The Timberland Co. et al.*, No. 06-cv-00484 (N.D. Ill.) ..................... 3

**State Court Cases:**

*In re Consumer Privacy Cases*,
  175 Cal. App. 4th 545 (Cal. Ct. App. 2009)................................... 23

**Statutory Provisions:**

47 U.S.C. § 227, *et seq* ......................................................... 4, 13

Fed. R. Civ. P. 23 ................................................................ 8, 10

**Miscellaneous Authorities:**

ALBA CONTE & HERBERT B. NEWBERG, *Newberg on Class Actions*
  (4th ed. 2002)................................................................... 8

*Federal Judicial Center, Judges' Class Action Notice and Claims
Process Checklist and Plain Language Guide* (2010)........................................ 8

*In re Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991,* 7 FCC Rcd. 8752 (1992) ....................................... 13-14

*In the Matter of Rules & Regulations Implementing the Tel.
Consumer Prot. Act of 1991,* 27 F.C.C.R. 1830 (2012) .................................. 13

*Manual for Complex Litigation, Third* (1995)....................................... 10

R. LeCours, Note, *Steering Clear of the "Road to Nowhere": Why the
BMW Guideposts Should Not be Used to Review Statutory Penalty
Awards*, 63 Rutgers L. Rev. 327 (2010) ............................................ 18

# I.      INTRODUCTION

Every day, consumers nationwide are subjected to a barrage of advertisements and solicitations, some specifically targeted to reflect an individual's spending habits, others randomly distributed in the hopes of casting the widest net possible. Advertisers have become quick to capitalize on the latest technological advances in order to develop newer and faster means to distribute their messages, though often failing to consider the consent of the consumer to receive them.  One burgeoning method is the use of text messages, or "SMS" marketing, which allows businesses to send short text messages to the cellular phones of consumers, often without the express authorization required by statute.  In fact, a recent Pew study indicates that 69% of consumers have been the recipients of an unsolicited text message advertisement at some point.[1]

The instant Settlement Agreement (the "Settlement Agreement," which can be found at dkt. 41-1) before the Court represents an effort to stem the tide of unsolicited text messages, and involves allegations that Defendant Steven Madden, Ltd. ("Defendant" or "Madden") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA"), when it caused the transmission of allegedly unsolicited text messages promoting Madden's "Mobile Club" to the cell phones of more than two hundred thousand consumers. Now, following a year and a half of litigation, mediation with the Honorable Edward A. Infante (ret.), and multiple rounds of arm's-length negotiations, the Parties have reached the instant Settlement Agreement for which they now seek final approval pursuant to Federal Rule of Civil Procedure 23(e).

On September 25, 2012, the Court granted preliminary approval of the Settlement, (dkt. 45), approving the broad Notice Plan[2] set forth in the Settlement as "the best notice practicable under the circumstances" and finding that it complied

---

[1] *See* http://www.pewinternet.org/Reports/2012/Mobile-phone-problems/Main-findings/Mobile-phone-problems.aspx.

[2] Capitalized terms retain their meaning as defined in the Settlement Agreement.

1  fully with both Rule 23 and Due Process. (*Id*. pg. 10-13.) The Settlement

2  Administrator has successfully implemented the Notice Plan, and the deadline for

3  submitting requests for exclusion and objections has now expired. There has been

4  an overwhelmingly favorable reaction by members of the Class to the Settlement—

5  only one objection has been filed on behalf of two objectors (although one objector

6  quickly attempted to withdraw her objection) and only seven Class Members have

7  requested to be excluded. To date, nearly 14,000 Class Members have submitted

8  claims, and the claims deadline does not expire until April 11, 2013.

9       This response is not surprising given the exceptional results achieved for the

10  Class through the Settlement. First, each Class Member who received a text

11  message promoting Madden's products and who submits a short and simple Claim

12  Form by April 11, 2013, will receive up to a $150 settlement payment to be

13  distributed from the $10,000,000 Settlement Fund. This Settlement Fund has

14  already been used to pay administrative expenses, the costs of effectuating proper

15  notice to the Class and, should the Court grant final approval, will be used to pay

16  Class Members who submitted claims, incentive awards to the Class Representative,

17  and attorneys' fees and expenses. In addition, Madden has also agreed to

18  prospective relief prohibiting it, or any agent it hires, from sending text messages

19  without first obtaining prior express consent in writing and requiring it to maintain

20  proof of that consent for at least four years. The prospective relief applies to not

21  only Madden, but also to any contractual partner of Madden. Further, the

22  prospective relief requires that any such written prior express consent contain a

23  "clear and conspicuous" disclosure that explains to the consumer that he or she is

24  consenting to receive text message advertisements from or on behalf of Madden.

25       Even though the $150 payments made available to the Class, the single

26  objection, and the inherent risk attendant in continued litigation of a complex class

27  action each favor final approval, the Court need not rule on a blank slate in deciding

28  the fairness, reasonableness, and adequacy of this agreement, as it is predicated on

1   similar agreements approved in federal courts nationally.[3]  Accordingly, the Plaintiff

2   respectfully requests that this Court grant final approval of the Agreement and

3   dismiss the Released Claims with prejudice.

4   **II.    THE FACTS, THE LAW, AND THE LITIGATION HISTORY**

5          Plaintiff alleges her privacy was invaded when she received text message calls

6   on her cellular telephone promoting the products of Defendant.  Plaintiff claims that

7   Madden transmitted text messages to not only her, but also to over 200,000 other

8   consumers without first obtaining their prior express consent.  To effectuate its

9   marketing program, Madden collected consumers' cellular telephone numbers at the

10  point-of-sale, on Madden websites, and through mobile marketing, and then caused

11  text message transmissions to be sent out to these consumers that advertised Madden

12  products.[4]  Defendant then transmitted text messages to these individuals as part of

13  the "Steve Madden Mobile Club," a text message-marketing program it began with

14

15          [3] A comparison to similar class action settlements further supports a finding of
    fairness, reasonableness, and adequacy of the instant Settlement.  *See, e.g., Satterfield v.*
16  *Simon & Schuster, Inc. et al.*, No. 06-cv-02893-CW (N.D. Cal.) (approving settlement
    creating a $10 million settlement fund for the transmission of 59,000 text messages,
17  entitling each class member to a $175 settlement payment); *Kramer v. Autobytel, Inc., et
    al.,* No. 10-cv-2722 (N.D. Cal. 2012) (approving settlement creating a $10 million
18  settlement fund for the transmission of millions of text messages, entitling each class
    member to a $100 settlement payment); *Rojas v. Career Education Corp.*, No. 10-cv-
19  5260 (N.D. Ill. 2012) (approving settlement creating $19,999,400 settlement fund for the
    transmission of approximately 100,000 text messages, entitling each class member to a
20  $200 settlement payment); *Lozano v. Twentieth Century Fox Film Corp.*, No. 09-cv-6344
    (N.D. Ill.) (approving settlement creating a $16 million settlement fund for the
21  transmission of 98,000 text messages, entitling each class member to a $200 settlement
    payment); *Weinstein v. The Timberland Co. et al.*, No. 06-cv-00484 (N.D. Ill.) (approving
22  settlement creating a $7 million settlement fund for the transmission of 40,000 text
    messages, entitling each class member to a $150 settlement payment); *Espinal v. Burger
23  King, Corp.*, No. 09-cv-20982 (S.D. Fla.) (approving settlement creating a $510,000 fund
    for the transmission of approximately 1,800 text messages, entitling each class member to
24  a $250 settlement payment.)  Copies of the settlement agreements are attached as
    Exhibits A, B, C, D, E & F, respectively.

25          [4] The facts of this case were also set forth in Plaintiff's Motion for Award of
26  Attorneys' Fees, Expenses, and Incentive Award.  (*See* Dkt. 52.)  The evidence
    supporting Plaintiff's factual assertions, and the applicable law under the TCPA, is set
27  forth in greater detail in the confidential submission made to this Court per the Court's
    September 25, 2012 Order.  (*See* Dkt. 45 at 10.)  This confidential memorandum outlines
28  Plaintiff's determination of the merits of this case, as well as Plaintiff's valuation of this
    lawsuit.

third-party MoGreet, Inc.  On July 19, 2011, Ellison brought a single-count Complaint against Madden claiming violations of the TCPA based on these alleged unauthorized text messages.

Congress enacted the TCPA to combat the growing threat to privacy being caused by automated telemarketing practices and made it "unlawful . . . to make any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii); *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012).  The TCPA applies with equal force to the making of text message calls as it does to the making of voice calls to cellular phones. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1170 (N.D. Cal. 2010)*.*  It also sets statutory damages of $500 per violation and provides for an injunction prohibiting the further transmission of such messages.  47 U.S.C. § 227(b)(3)(A-B).

The parties reached this Settlement after utilizing private mediation with retired federal judge Edward Infante of JAMS in several rounds of arm's-length negotiations.  Prior to this mediation, the parties engaged in discovery in order to allow all of the pertinent facts and evidence available to guide the mediation process.  This mediation process included a frank assessment of the merits of the parties' claims and defenses, as well as the Defendant's ability to satisfy any judgment or settlement reached in this case.  Ultimately, the parties were not able to reach an agreement and Judge Infante made a mediators' proposal, which both parties subsequently accepted, and which formed the principal terms of this settlement.  In the following months, the parties continued negotiations of other terms in the agreement, and on July 30, 2012, reached agreement on all the terms of the Settlement Agreement.

On September 25, 2012, the Court granted preliminary approval of the Settlement, (dkt. 45), approving of the comprehensive Notice Plan set forth in the Settlement and finding that it complied fully with both Rule 23 and Due Process.

1  (*Id.* pg. 13.)  The Settlement Administrator has successfully implemented the Notice

2  Plan, and the deadline for submitting requests for exclusion and objections has now

3  expired.  There has been an overwhelmingly favorable reaction by members of the

4  Class to the Settlement—only one Class Member objected and only seven (7) Class

5  Members have requested to be excluded.

6  **III.   TERMS OF THE SETTLEMENT AGREEMENT**

7          The terms of the Settlement preliminarily approved by the Court are set forth

8  in the Settlement Agreement, which can be found at dkt. 41-1, and are briefly

9  summarized below:

10         **A.   Class Definition**

11         At preliminary approval the Court certified a Settlement Class comprised of

12  "all persons Nationwide who from July 2010, until the date of Preliminary

13  Approval, were sent any Text Message(s) promoting Steve Madden products and

14  events from short codes 91919 or 623336."  (Dkt. 45; *see also* dkt. 41-1 § 1.33.)

15         **B.   Individual Class Member Relief**

16         The Settlement Agreement entered into between the parties requires the

17  Defendant to establish a $10,000,000 Settlement Fund for the benefit of the Class.

18  (Dkt. 41-1 § 1.35.)  The settlement agreement requires Madden to set one half of the

19  Settlement Fund ($5,000,000) into an interest-bearing escrow account at the outset.

20  (Dkt. 41-1 § 1.35.)  This was done to ensure that there are funds are available to pay

21  claimants as well as notice and administration costs.  Each Class Member who files

22  a valid claim is entitled to a payment of $150 in cash, or a lesser *pro rata* share

23  should the amount of claims exceed the $10,000,000 Settlement Fund.  (Dkt. 41-1 §

24  2.1.)

25         **C.   Prospective Relief**

26         This Settlement provides strong prospective relief that will dramatically alter

27  Defendant's advertising practices and ensure that consumers do not receive text

28  messages from Madden going forward unless those consumers have provided prior

express consent, in writing, to be contacted.  The various aspects of the prospective relief are detailed below:

   ***1.     Obtaining Prior Express Consent***:  The Settlement Agreement states that before Madden transmits text messages to consumers, it must obtain the consumers' prior express consent, in writing, to receive such text messages.  (Dkt. 41-1 § 2.2.) The Settlement Agreement requires that any written authorization must contain "clear and conspicuous" disclosure language that ensures the consumer understands that he or she is consenting to receive text messages from Madden. (*Id.*)  This ensures that the consent disclosures are not "buried" in fine print.

   ***2.     Proof of Consent***:  The Settlement Agreement requires Madden to retain all written proof of a consumer's prior express consent for a period of four (4) years after receipt.  (Dkt. 41-1 § 2.2.)

   ***3.     Third-Party Agreements***:  The prior express consent requirement and clear and conspicuous disclosure requirement apply to any third parties with whom Madden contracts to conduct advertising and marketing. (Dkt. 41-1 § 2.2.)

   ***4.     Prohibition on Future Text Messages***:  The Settlement makes it easy for consumers to "opt-out" of receiving additional text message calls from Madden—the Claim Form allows Class Members to specifically request that their phone numbers be removed from Defendant's databases.  (Dkt. 41-1 § 2.3.)

   **D.     Other Relief**

   In addition to the individual and prospective relief detailed above, the Defendant has agreed to the following relief:

   ***1.     Payment of Notice and Administrative Fees***

   Madden has agreed to pay the settlement administration expenses using money from the $10,000,000 Settlement Fund that it created.  (Dkt. 41-1 § 1.31.) These administrative expenses include the cost of identifying Class Members using the Class List, the cost of effectuating direct notice to the Class Members, the cost of

Publication Notice, the cost of Internet publication notice, the cost of targeting Internet advertising, and the cost of providing CAFA Notice to the Attorneys General of each U.S. State, the Attorney General of the United States, and other required government officials under 28 U.S.C. § 1715. (Dkt. 41-1 § 4.2.)  The Claim's Administrator estimates that the costs of notice and administration will be approximately $459,449.83.  (Declaration of Cameron R. Azari, Director of Epiq Legal Noticing ("Azari Decl.") attached hereto as Exhibit G, ¶ 21.)

### 2.     *Compensation for the Class Representative*

In addition to any award under the Settlement, and in recognition of her time and effort on behalf of the proposed Settlement Class, Madden has agreed to provide Class Representative Samantha Ellison, subject to Court approval, an incentive award of $10,000.  (Dkt. 41-1 § 8.3.)  Defendant has agreed that such an award to Ms. Ellison is reasonable and that it will not oppose such an award either directly or indirectly.  (*Id.*)

### 3.     *Payment of Attorneys' Fees and Expenses*

Under the Settlement and subject to Court approval, the attorneys' fees and expenses will be provided to proposed Class Counsel in the amount of $2,500,000. The Defendant has agreed to pay the attorneys fees and expenses out of the Settlement Fund.  (Dkt. 41-1 § 8.1.)  Defendants agree that such an award to Class Counsel is reasonable and that they will not oppose such an award either directly or indirectly.  (*Id.*)  On December 24, 2012, Plaintiff filed with the Court her Motion for Award of Attorneys' Fees, Expenses, and Incentive Award.  (*See* Dkt. 49.)[5]  A copy of this Motion was posted on the settlement website on December 26, 2012.

### E.     Release

In exchange for the relief provided above, and upon the entry of a final order

---

[5] Per the instructions of the Court, Plaintiff filed a *Renewed* Motion for Award of Attorneys Fees, Expenses and Incentive Award on January 2, 2013, (dkt. 52), which was substantively identical to the Motion filed on December 24, 2012 and posted on the settlement website on December 26, 2012.

1   approving this Settlement, Defendant and each of its related affiliates and entities

2   will be released from any claims, whether known or unknown, arising out of or

3   relating to Madden's involvement in the transmission of any unauthorized text

4   messages from Short Codes 91919 or 623336.  (*See* Dkt. 41-1 §§ 3, 1.26-1.27 for the

5   full release language.)

6   **IV.   THE NOTICE PLAN COMPORTS WITH DUE PROCESS**

7          Before the Court may grant final approval of a settlement, Fed. R. Civ. P.

8   23(c)(2) requires that the Court determine that the settlement provides the class with

9   the "best notice [] practicable under the circumstances, including individual notice to

10  all members who can be identified through reasonable effort."  Fed. R. Civ. P.

11  23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S. Ct.

12  2140, 2150, 40 L. Ed. 2d 732 (1974).  Notice is satisfactory where it "generally

13  describes the terms of the settlement in sufficient detail to alert those with adverse

14  viewpoints to investigate and to come forward and be heard."  *Mendoza v. Tucson*

15  *Sch. Dist. No. 1,* 623 F.2d 1338, 1352 (9th Cir.1980) *disapproved of on other*

16  *grounds by Evans v. Jeff D.*, 475 U.S. 717, 106 S. Ct. 1531, 89 L. Ed. 2d 747 (1986);

17  *see also* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:53 at

18  167 (4th ed. 2002) (notice is "adequate if it may be understood by the average class

19  member.").  Adequate notice sets forth the nature of the action, defines the class to

20  be certified, the class claims and defenses at issue, while also explaining to class

21  members that they may enter an appearance through counsel if so desired, request

22  exclusion from the settlement class, and that any judgment will be binding on all

23  class members.  *See* Fed. R. Civ. P. 23 (c)(2)(B).  Ultimately, the Federal Judicial

24  Center has concluded that a notice plan that reaches at least 70% of the class is

25  reasonable.  *Federal Judicial Center, Judges' Class Action Notice and Claims*

26  *Process Checklist and Plain Language Guide* (2010), p. 3.  The Parties have strictly

27  adhered to these requirements in directing notice to Class Members.

28

To maximize the number of Class Members submitting claims, Plaintiff engaged in discovery that allowed her to identify with reasonable certainty the members of the Class.  (*See* Declaration of Jay Edelson, which can be found at dkt. 52-1 ¶¶ 8-11.)  Once this was accomplished, Plaintiff insisted on a comprehensive notice plan that includes direct mail, email, targeted Internet advertising, and publication notice in order to reach the most Class Members.  (Dkt. 41-1 § 4.2.)  Class Members are allowed to submit a claim until forty-five days after Final Approval is granted.  (Dkt. 41-1 § 2.1(a).)

The notice plan approved by the Court has been fully carried out by professional settlement administrator Epiq Legal Noticing in compliance with Due Process and Rule 23.  (*See* Azari Decl. ¶¶ 7-18.)  This effort included the mailing of individual postcard notice to 114,944 Class Members, disseminating Email Notice, publishing Summary Publication Notice in *People* and *Cosmopolitan* magazines[6], posting Internet Banner Notices that generated over 30.5 million "impressions" on over 900 websites, maintaining a settlement website, and establishing a toll-free telephone number so that Class Members could gain more information about the settlement and request a Claim Form.  (Azari Decl. ¶¶ 7-18.)  The Claims Administrator conservatively estimates that the Notice Plan reached approximately 77.5% of the Class Members.  (*Id.* ¶ 23.)  The notice documents that reached Class Members clearly explained to Class Members their rights.  (*Id.* ¶¶ 23-25.)

As of the date of filing of this Motion, there has been a very positive response to the settlement, with 13,934 Class Members filing claims.  (Azari Decl. ¶ 20.)  Only seven (7) Class Members have requested exclusion from the settlement, and one (1) Class Member has objected.  (Azari Decl. ¶¶ 19-20.)  The Claims Administrator will continue processing claims through April 11, 2013, (Azari Decl.

---

[6] Epiq accomplished the publication notice after conducting a rigorous analysis of readership and products usage data that was used to ensure it reached the maximum amount of Class Members.  (Azari Decl. ¶¶ 12-13.)  U.S. federal and state courts have relied on such data sources in the past.  (*Id.* ¶ 12.)

1  ¶ 20), meaning there will undoubtedly be additional claims made before the claims

2  period expires.  Once the claims period is closed, the claims administrator will pay

3  approved claims from the $10 million Settlement Fund in accordance with the

4  Settlement Agreement.  (*Id.* ¶ 20.)

5  **V.      THE SETTLEMENT WARRANTS FINAL APPROVAL**

6       Court approval of a class action settlement is a two-step process, with the first

7  step being preliminary approval, and the second step being final approval.  *Nat'l*

8  *Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)

9  (citing *Manual for Complex Litigation, Third,* § 30.41, at 236–37 (1995)).  "Strong

10  judicial policy [] favors settlements, particularly where complex class action

11  litigation is concerned."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th

12  Cir. 1992). Even still, Rule 23(e) provides that a class action shall not be dismissed

13  or compromised without the approval of the court.  Fed. R. Civ. P. 23(e).

14       Before it may grant approval, the Court must first determine whether the

15  proposed class action settlement is fundamentally fair, adequate, and reasonable.

16  *Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco,* 688

17  F.2d 615, 625 (9th Cir. 1982), *cert. denied,* 459 U.S. 1217 (1983)).  In order to

18  evaluate the fairness, reasonableness, and adequacy of a proposed class settlement,

19  courts are instructed to weigh the following non-exhaustive list of factors: "(1) the

20  strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration

21  of further litigation; (3) the risk of maintaining class action status throughout the

22  trial; (4) the amount offered in settlement; (5) the extent of discovery completed and

23  the stage of the proceedings; (6) the experience and views of counsel; (7) the

24  presence of a governmental participant; and (8) the reaction of the class members to

25  the proposed settlement."  *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575

26  (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.

27  1998)); *see also Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir. 2012).  No one

28  factor controls, and the "importance to be attached to any particular factor will

depend upon … the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice,* 688 F.2d at 625.

Ultimately however, while the court has complete discretion to approve or reject a settlement, judges are encouraged to give proper deference "to the private consensual decision of the parties." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (quoting *Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution. . . .")). In "the Ninth Circuit, a court affords a presumption of fairness to a settlement if: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Romero v. Producers Dairy Foods, Inc.*, No. 05-cv-0484, 2007 WL 3492841, at *2 (E.D. Cal. Nov. 14, 2007).

Here, the Settlement should be presumed fair, as the parties are all represented by experienced counsel whose negotiations were conducted through retired Judge Edward Infante after being provided with sufficient information about the alleged conduct at issue and the number of Class Members.  These facts and the paucity of objections and exclusion requests support this presumption of fairness, especially when coupled with the significant results achieved for the Class in the face of Defendant's numerous defenses in this Action and Defendant's financial inability to withstand any significant judgment against it.  The Court should find that this Settlement is fair, reasonable and adequate, provides the Plaintiff and Class Members with substantial relief, and helps avoid the "time, cost, and rigors of formal litigation." *Martin v. AmeriPride Servs., Inc.*, No. 08-CV-440-MMA JMA, 2011 WL 2313604, at *6 (S.D. Cal. June 9, 2011).  An analysis of each factor addressed below reinforces the Court's preliminary finding that the Settlement meets these requirements and is worthy of final approval.

**A.     The Strength of Plaintiff's Case**

The first factor courts look to in analyzing the fairness, reasonableness, and adequacy of a settlement is the strength of the plaintiff's case and the range of possible recovery in light of the risks of continued litigation.  This calls for balancing "the vagaries of litigation and [] the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation."  *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159, at *5 (S.D. Cal. Nov. 5, 2012) (citing *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526); *see also Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 424–25, 88 S. Ct. 1157, 1163, 20 L. Ed. 2d 1 (1968) ("Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.").

The analysis of Plaintiff's probability of success on the merits, however, is not rigid or beholden to any "particular formula by which the outcome must be tested," nor is the Court supposed to "reach any ultimate conclusions of the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Garner*, 2010 WL 1687832, at *9 (citing and quoting *Rodriguez*, 563 F.3d at 965; *Officers for Justice*, 688 F.2d at 625). "Rather, the Court's assessment of the likelihood of success is nothing more than an amalgam of delicate balancing, gross approximations and rough justice.'" *Garner*, 2010 WL 1687832, at *9 (citing *Officers for Justice*, 688 F.2d at 625) (internal quotations omitted). Given the subjective components inherent in handicapping any potential range of recovery, "the Court may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner*, 2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965).

First, Plaintiff and Class Counsel believe the claims to be strong and are confident that if the case were to proceed to summary judgment or to trial, they would likely succeed on the merits.  The TCPA provides for $500 in damages for each violation setting the statutory cap on the maximum for potential recovery for the Settlement Class here at over one hundred million dollars.  *See* 47 U.S.C. § 227(b)(3)(B).  Second, a growing body of precedent indicates that Plaintiff would ultimately succeed in both adversarial class certification and trial.  *See, e.g., In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830 (2012); *Agne v. Papa John's Int'l, Inc.*, --- F.R.D. ----, 2012 WL 5473719, at \*13 (W.D. Wash. Nov. 9, 2012) (certifying both a national and state subclass in TCPA text message action); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727-28 (N.D. Ill. 2011) (denying defendant's motion for summary judgment); *Bridgeview Heath Care Ctr. Ltd. v. Clark*, No. 09-cv-05601, 2011 WL 4585028, at \*6 (N.D. Ill. Sept. 30, 2011) (same).

However, Defendant has repeatedly indicated to Class Counsel that it believes it would ultimately prevail on one or all of the following arguments: (1) Defendant cannot be liable because it did not transmit the messages itself, it hired MoGreet to do so; (2) that when Plaintiff gave Defendant her cell phone number while visiting Defendant's store she consented to receive the text messages at issue;[7] and (3) that whether the Plaintiff provided "prior express consent" is an individualized issue that makes class action treatment inappropriate.  Some judicial authority exists supporting these arguments.  *See, e.g., Thomas v. Taco Bell Corp.*, --- F. Supp. 2d --, 2012 WL 3047351, at \*4 (C.D. Cal. June 25, 2012) (declining to extend the TCPA to include liability for entity on whose "behalf" text message was sent without establishing traditional agency relationship); *Green v. DirecTv, Inc.*, No. 10-cv-117, 2010 WL 4628734, at \*3 (N.D. Ill. Nov. 8, 2010) (citing *In re Rules and*

---

[7] However, the court in *In re Jiffy Lube Intern., Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) indicated that merely providing one's telephone number is insufficient to establish prior express consent.  *Id.* at 1258, n. 7.

1   *Regulations Implementing the Telephone Consumer Protection Act of 1991,* 7 FCC

2   Rcd. 8752, 8769 (1992) and finding that plaintiff provided prior express consent to

3   be contacted by providing her telephone number to defendants); *Gene and Gene,*

4   *LLC v. Biopay LLC,* 541 F.3d 318, 327 (5th Cir. 2008) (stating that the predominant

5   issue in a TCPA case "is undoubtedly one of *individual* consent").  Several of these

6   issues are untested in the Ninth Circuit, introducing another layer of uncertainty to

7   the ultimate success of Plaintiff's case.

8          Yet even still, given the complexity of the issues still to be litigated and the

9   very real potential that Defendant may succeed on any of the above-referenced

10  issues on either a motion for summary judgment or at trial—depriving the Plaintiffs

11  and Class of any relief whatsoever—the instant Settlement was anything but a "sell-

12  out."  Quite the opposite, Plaintiff recognized that issues of class certification as well

13  as summary judgment presented significant hurdles, ones that could only be truly

14  avoided through a compromise that would benefit both the Plaintiff and Class, as

15  well as Defendant.  *See Bellows v. NCO Fin. Sys., Inc.*, No. 07-CV-01413-W-AJB,

16  2008 WL 5458986, at *7 (S.D. Cal. Dec. 10, 2008) (noting that "the very essence of

17  a settlement agreement is compromise, a yielding of absolutes and an abandoning of

18  highest hopes . . . in exchange for the saving of cost and elimination of risk, the

19  parties each give up something they might have won had they proceeded with

20  litigation. . . .") (citing *Officers for Justice*, 688 F.2d at 624).  Plaintiff recognizes the

21  inherent risk in any litigation, much less a class action of this size and magnitude,

22  and is thus satisfied that the proposed Settlement reflects the strength of her claims

23  without risking a judgment leaving the Class without any relief.  *See Nat'l Rural*

24  *Telecomms. Coop.,* 221 F.R.D. at 526 ("It has been held proper to take the bird in

25  hand instead of a prospective flock in the bush.").  Thus, given the strength of

26  Plaintiff's claims, the Court should find this factor satisfied.

27

28

**B.    The Risk of Continued Litigation**

The second "fairness" factor this Court may consider is "the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *In re Omnivision*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)). Where a settlement would help to avoid continued litigation that would delay or deprive the class of relief, and would "save [] the time, expense, and inevitable risk of litigation," *Officers for Justice*, 688 F.2d at 624, courts typically find this factor satisfied. *See Rodriguez,* 563 F.3d at 966 (favoring settlement and finding this factor satisfied where "[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years"); *Shames*, 2012 WL 5392159, at *6 (finding that where plaintiffs faced "significant uncertainty and risk of nonrecovery at trial," pre-trial settlement was "a reasonable tactical choice.").

Defendant has indicated that absent a settlement agreement it would vigorously pursue the above-mentioned claims and defenses.  (Dkt. 52-1 ¶ 17.) Considering the complexity of the case, the amount in controversy, and the stage of the proceedings, it is almost certain that the parties would invest substantial labor and expenses on a motion for class certification, a motion for summary judgment, expert witness discovery, and the briefing and arguing of a number of discovery motions, pre-trial motions, and evidentiary motions. (*Id.* ¶ 5.)  Further, a full trial would be expensive for both parties, requiring months of preparation and the calling of witness and experts from across the country.  (*Id.*)  Undoubtedly, with the potential for statutory damages totaling over one hundred million dollars, the losing party would absolutely appeal the decision, resulting in the expenditure of even more time and money.  (*Id.* ¶ 17.)  With these expenses still to come, and the inherent risk involved in any continued litigation, the Court should find that the Settlement militates in favor of this factor.

C.     The Risk of Maintaining Class Action Status

Similar to the risk inherent in pursuing the merits of the case, is the risk of certifying and then maintaining class status throughout the litigation.  This risk is not exclusive however to instances where a plaintiff has already managed to successfully move for class certification prior to settlement.  In fact, courts will still consider this factor even where a settlement is reached prior to class certification, given that pre-certification concerns validate the risk both parties face should a plaintiff succeed or fail in certifying the class.  *See Gardner v. GC Servs., LP,* No. 10-CV-0997-IEG CAB, 2012 WL 1119534, at *4 (S.D. Cal. Apr. 2, 2012) (recognizing the risk class certification poses for both parties and acknowledging the benefits of settlement prior thereto).

Irrespective of the merits, Class Counsel is confident that given the uniform nature of Defendant's alleged conduct toward the Class, certification is proper. The key issues with regard to disclosure are common ones: whether Defendant sent text messages without prior express consent; whether the equipment used to send such text messages falls under the statutory definition of an "automatic telephone dialing machine"; and whether Defendant's conduct violated the TCPA.  Regardless of the answers, these questions commonly focus on Defendant's conduct, rather than the Class's.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 2556, 180 L. Ed. 2d 374 (2011) (explaining that commonality is found where the claims of all class members "depend upon a common contention," and "even a single common question will do").

Nonetheless, were litigation to continue, the Parties would face a motion for adversarial class certification.  For the Plaintiff, failure to certify a class would mean the end of her action, foreclosing any recovery for proposed Class Members, and eviscerating the class action.  As noted above, although the weight of authority favors the certification of TCPA class actions under similar facts, *Agne*, 2012 WL 5473719, at *13, denial of adversarial class certification remained a possibility.  *See*

*Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1169-70 (S.D. Ind. 1997). Given the certification risk both sides face, the Court should find the decision to settle prior to class certification reasonable and supporting the fairness of the Settlement Agreement.

### D.   The Amount Offered in Settlement

To determine whether the overall settlement amount negotiated by the parties is fair, reasonable, and adequate, courts "may compare the settlement amount to the parties' estimates of the maximum amount of damages" that would be recovered if the action were successfully litigated at trial. *Martin*, 2011 WL 2313604, at *6. While the total amount offered, measured against the potential recovery the class might have received as the result of a full trial on the merits is relevant, "[t]his circuit has long deferred to the private consensual decision of the parties." *Rodriguez*, 563 F.3d at 965. Where the settlement is the result of "an arm's-length, non-collusive, negotiated resolution," courts "put a good deal of stock" in the agreement reached by the parties. *Id.* (citing *Hanlon,* 150 F.3d at 1027). This is because courts recognize that "[i]n reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." *Rodriguez*, 563 F.3d at 965. Specifically, in cases involving statutory damages, the court is not required to find "a specific monetary value corresponding to each of the plaintiff class's statutory claims and compare the value of those claims to the proffered settlement award," as this is a question of fact that must be proven at trial. *Lane*, 696 F.3d at 823. Here, the instant settlement amount negotiated for the Class weighs heavily in favor of finding this factor satisfied.

If the 203,254 person Class were to succeed at trial on its TCPA claims, it would theoretically be entitled to $101,627,000. Such a massive verdict would be wholly unobtainable: Madden would be forced out of business, and the Class would

1   likely be left out to dry by the bankruptcy process.  However, beyond the

2   impossibility of collection, any such recovery would likely be reduced judicially.[8]

3   While the Supreme Court has yet to rule on the constitutionality of disproportionate

4   federal statutory damages, trends in case law have identified limitations on such

5   massive recovery. To that end, courts have observed that "the potential for a

6   devastatingly large damages award, out of all reasonable proportion to the actual

7   harm suffered by members of the plaintiff class, may raise due process issues."

8   *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003); *see also*

9   *Blanco v. CEC Entm't Concepts L.P.*, No. 07-cv-0559 GPS, 2008 WL 239658 (C.D.

10   Cal. Jan. 10, 2008).

11       Here, in comparison, a theoretical $101,627,000 statutory damage award

12   would "completely swallow up" Steve Madden's 2011 net income of $97.2 million,

13   and thus, would be "grossly disproportionate" to the harm alleged.  (*See* Steven

14   Madden, Ltd., Annual Report (Form 10-K) (Feb. 29, 2012), attached hereto as

15   Exhibit H); *Blanco,* 2008 WL 239658, at *2.  Facing such a massive statutory

16   penalty, the Court would in all likelihood reduce the award to a more manageable

17   number. Where the monetary recovery is comprised purely of statutory damages (as

18   is the case here), the Ninth Circuit has found that a settlement fund of $9.5 million

19   would be "substantial under most circumstances."  *Lane,* 696 F.3d at 824 (9th Cir.

20   2012).  Further, in this case (unlike in *Lane*) the Class Members are entitled to up to

21

22

23       [8] Though Plaintiff maintains that the sheer size of a statutory damages award cannot
render it unconstitutional—*see generally* R. LeCours, Note, *Steering Clear of the "Road
to Nowhere": Why the BMW Guideposts Should Not be Used to Review Statutory Penalty

24   *Awards*, 63 Rutgers L. Rev. 327 (2010); *see also Cooper Indus., Inc. v. Leatherman Tool

25   *Group, Inc.*, 532 U.S. 424, 443, 121 S. Ct. 1678, 1689, 149 L. Ed. 2d 674 (2001) ("I
continue to believe that the Constitution does not constrain the size of punitive damages

26   awards") (Thomas, J., concurring) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559,
599, 116 S. Ct. 1589, 1610, 134 L. Ed. 2d 809 (1996) (Scalia, J., joined by Thomas, J.,

27   dissenting))—she acknowledges the likelihood that if she obtained a judgment on the
merits and a statutory damage award of over $100 million, in all reality, the Court could

28   reduce the award using remittitur or find the award unconstitutionally excessive.

a \$150 cash award.  In addition, the payment of a cash settlement to the Class "is a good indicator of a beneficial settlement."  *See Rodriguez*, 563 F.3d at 965.

### E.    The Extent of Discovery and Stage of Litigation

The next factor requires the Court to consider both the extent of the discovery conducted to date and the stage of the litigation as indicators of class counsel's familiarity with the case and ability to make informed decisions. *OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego*, 213 F. 3d at 459)).  "[A]s long as the parties have sufficient information to make an informed decision about settlement, formal discovery is not a necessary ticket to the bargaining table."  *Gardner*, 2012 WL 1119534, at *5 (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)) (internal quotations omitted).  What is required is that the parties reach a point in the litigation where they have "a clear view of the strengths and weaknesses of their cases." *Bellows*, 2008 WL 5458986, at *8 (quoting *In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985)).  A compromise based on an understanding of the legal and factual issues and a "genuine arms-length negotiation is presumed fair." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528 (citations omitted).

Here, although the Parties discussed the possibility of going to mediation early on, Plaintiff indicated that certain discovery would be necessary before any settlement discussion could proceed.  (Dkt. 52-1 ¶ 8.)  As such, the Parties filed a Rule 26(f) statement with the Court on November 3, 2011, (dkt. 27), and the Plaintiff subsequently began issuing discovery.  This discovery included several rounds of interrogatories and requests for production on Defendant, as well as subpoenas issued on third parties with knowledge of the text messages transmitted by Defendant.  (Dkt. 52-1 ¶¶ 9-10.)  In response, Madden produced nearly 300 gigabytes of electronically stored information consisting of documents and communications that both Plaintiff's counsel and Plaintiff reviewed.  (*Id.* ¶ 11.) Plaintiff's counsel also received discovery from third parties identifying the

1   telephone numbers of putative Class Members that received text messages sent on

2   behalf of Defendant.  (*Id.*)

3        At the mediation, the Parties engaged in a day-long, arm's-length negotiation

4   during which they discussed at length their respective positions and views on the

5   case.  (Dkt. 52-1 ¶¶ 12-13.)  As such, the Parties were provided with numerous

6   opportunities to obtain the information necessary to fully understand the facts and

7   merits of the claims and to properly evaluate and structure the best settlement

8   possible under the circumstances.  Class Counsel also had the benefit of extensive

9   experience in the realm of TCPA litigation from which to make informed decisions

10  about the claims in this case.  (Dkt. 52-¶ 4.) Thus, the Parties had more than

11  sufficient information on hand to evaluate their litigation position, further supporting

12  the reasonableness of the instant Settlement.

13       **F.    The Experience and Views of Counsel**

14       Courts consistently rely on the settlements reached by experienced counsel

15  given that "[p]arties represented by competent counsel are better positioned than

16  courts to produce a settlement that fairly reflects each party's expected outcome in

17  litigation."  *In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995).  This

18  presumption is strengthened when class counsel has specific experience in the type

19  of claims being litigated.  *See Martin,* 2011 WL 2313604, at *7; *see also Nat'l Rural*

20  *Telecomms. Coop.,* 221 F.R.D. at 528 ("'[g]reat weight' is accorded to the

21  recommendation of counsel, who are most closely acquainted with the facts of the

22  underlying litigation.").

23       Class Counsel specialize in litigating consumer class actions of similar size

24  and complexity and have pioneered the application of the TCPA to text-messaging

25  technology.  *See Satterfield*, 569 F.3d 946 (serving as counsel for plaintiff in Ninth

26  Circuit decision applying text-messaging technology to the TCPA); (Firm Resume

27  of Edelson McGuire LLC, at Dkt. 52-1 ¶ 4.)  Edelson McGuire LLC has been

28  recognized as "pioneers in the electronic privacy class action field, having litigated

1   some of the largest consumer class actions in the country on this issue." *See In re*

2   *Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal. 2010).  They have frequently

3   been appointed lead class counsel by courts throughout the country, and they have

4   the resources and experience necessary to conduct litigation of this nature.  (*See*

5   Firm Resume of Edelson McGuire, Dkt. 52-1 ¶ 4.)  Moreover, the law firm of Parisi

6   Havens also has significant experience in class action litigation and cases involving

7   the TCPA.  (*See* Firm Resume of Parisi & Havens, attached as Exhibit I.)

8          While familiar with the issues involved, Class Counsel were pitted against

9   highly-experienced defense counsel from a top-tier national defense firm who

10  promised to continue to mount a formidable defense.  (Dkt. 52-1 ¶¶ 6, 17.)  Arriving

11  at a settlement in this case required extensive negotiations in mediation with Judge

12  Infante, which were conducted only after having nearly completed discovery.  (Dkt.

13  52-1 ¶¶ 8-14.)  Thus, faced with the prospect of receiving nothing should Madden

14  succeed in any aspect of its defense, Class Counsel are confident based on the

15  information in their possession that payment of $150 per Class Member is an

16  exceptional result in this litigation.  This factor thus also weighs in favor of final

17  approval of the Settlement.

18         **G.     The Presence of a Governmental Participant**

19         This case was not instituted by a government agency, and no governmental

20  agency intervened or otherwise participated in this lawsuit.  Therefore, this factor

21  does not apply to the Court's analysis.  *See Nat'l Rural Telecomms. Coop.*, 221

22  F.R.D. at 528.

23         **H.     The Reaction of Class Members to Date**

24         Class Members have viewed this settlement favorably—only seven

25  individuals requested exclusion and only one objection was filed on behalf of two

26  objectors, although one objector attempted to withdraw after it was shown that she

27  was not a Class Member.  A lone objection in a class of over 200,000 individuals

28  provides strong evidence of the favorability of the settlement to the class.  *See, e.g.,*

*In re Mego,* 213 F.3d at 459; *Churchill Vill.,* 361 F.3d at 577; *Hartless v. Clorox Co.,* 273 F.R.D. 630, 641 (S.D. Cal. 2011).  In addition, nearly 14,000 Class Members have filed claims, and this number will undoubtedly increase after Final Approval, as the claims deadline does not expire until April 11, 2013.

Plaintiff will address the lone objection in a separate memorandum that will show the objection to be without merit.  Regardless, the small number of opt-outs and objections demonstrates the Class's overwhelmingly positive reaction to the Settlement as a whole, especially when compared to other settlements approved in this Circuit.  *Compare Churchill Vill.,* 361 F.3d at 577 (affirming the district court's approval where 45 of 90,000 notified class members objected to the settlement and 500 class members opted out of the settlement); *with Hartless,* 273 F.R.D. at 641 (settlement approved where only 10 people requested exclusion and three objected out of class of 9,000); *and In re Mego,* 213 F.3d at 459 (final approval granted in settlement with one objection out of a potential class of 5,400).

## I.   There Was No Collusion Between the Parties in Reaching the Settlement

In addition to the other factors, where, as here, a settlement is reached prior to class certification, courts often require a higher standard of fairness "to ensure class counsel and defendant have not colluded in settling the case."  *Martin,* 2011 WL 2313604, at *5 (citing *Hanlon,* 150 F.3d at 1026.  The factors most indicative of collusion between the parties are "(1) when counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded; (2) when the parties negotiate a clear sailing arrangement providing for the payment of attorneys' fees separate and apart from class funds; . . . and (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935, 947 (9th Cir. 2011) (internal citations and quotations omitted).  Each of these "warning signs" is designed to root out evidence of

1  collusion that "may not always be evident on the face of a settlement." *Id.*  None of

2  these elements is present in this Settlement.

3       First, Class Counsel are not receiving a disproportionate amount of the

4  Settlement.  Class Counsel's fees represent 25% of the cash benefit of the Settlement

5  Fund, non-inclusive of the prospective relief afforded in the settlement.  This

6  percentage falls right at the Ninth Circuit benchmark of 25% in common fund cases.

7  *Id.* at 942; *see also Powers v. Elchen,* 229 F.3d 1249, 1256 (9th Cir. 2000).  In

8  addition, the Settlement Agreement does not provide for payment of attorneys' fees

9  separate and apart from funds paid to the Class.  *Staton v. Boeing Co.*, 327 F.3d 938,

10  970 (9th Cir. 2003); *In re Bluetooth*, 654 F.3d at 948-49.  Class Counsel is seeking

11  its fees as a percentage of the total value created by the Settlement.

12       Second, while there is a reversion to Madden, there is no reversion of

13  attorneys' fees, which is what the *In re Bluetooth* court warned against.  654 F.3d at

14  947.  Just the opposite, the Settlement Agreement expressly provides that if any

15  portion of the requested fees are unawarded, they will revert to the Settlement Fund

16  and be used to pay Approved Claims of Class Members.  (Dkt. 41-1 § 8.2.)[9]

17       Finally, while there is a "clear sailing"[10] provision in the Settlement, the

18  requested fees were negotiated solely as a percentage of the overall value of the

19  Settlement, inextricably linking Class Counsel's fees to the value obtained for the

20  Class.  (Dkt. 52-1 ¶ 13.)  The Ninth Circuit's concerns regarding such provisions

21  stem primarily from instances in which the requested fee is agreed upon

22       [9] And there is nothing *per se* improper about a reverter, especially in cases such as
23  this where the claims rates were uncertain at the outset, *see McKinnie v. JP Morgan
Chase Bank, N.A.*, 678 F. Supp. 2d 806, 815 (E.D. Wis. 2009), and where the case does
24  not involve the disgorgement of ill-gotten gains back to consumers. *Nabal v. BJ's
Wholesale Club, Inc.*, No. 02-CV-2604, 2002 WL 32349137 (E.D. Pa. Aug. 2, 2002).
25  Courts throughout the country have approved similar settlements under the TCPA that
involved a reverter. *See, e.g.*, the settlement agreements attached to this Memorandum as
26  Exhibits A-F.
     [10] A "clear-sailing" provision in and of itself is not an indication of collusiveness, and
27  courts, including those in the Ninth Circuit, "recognize[] that clear sailing agreements are
routinely accepted in both the federal and California courts."  *Hartless,* 273 F.R.D. at
28  645; *see also In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 553 (Cal. Ct. App.
2009); *Malchman v. Davis*, 761 F.2d 893, 905 n. 5 (2nd Cir.1985).

independently of the amount provided for the class. *In re Bluetooth*, 654 F.3d at 947. Such an arrangement can enable a Defendant to "pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Id.* (citation omitted). Such concerns are not present in the instant case, as fees are a percentage of the total Settlement. In fact, Judge Infante's mediator's proposal was comprised of terms for *both* class relief and attorneys' fees. These facts again display a lack of collusion between the Parties and favor approval of the Settlement.

Most importantly, there is no actual collusion in this case. Both assurances of counsel and the presence of a neutral mediator are factors "weighing in favor of a finding of non-collusiveness," though neither is "on its own dispositive." *In re Bluetooth*, 654 F.3d at 948. Here, Judge Infante, the former chief magistrate for the Northern District of California, presided over the Parties' negotiations and ensured that the settlement process was conducted at arm's length. Judge Infante's active role in assisting the Parties with their arm's-length negotiations and in reaching the Settlement provides strong evidence of non-collusiveness. *In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011). Further, the parties did not agree to settle this case until all of the pertinent facts were gathered in discovery and analyzed. Thus, even when scrutinized under this stricter standard of fairness, the Settlement is free of any of the collusive elements addressed in *In re Bluetooth,* represents an extraordinary victory for the Class, and is substantially similar to numerous other TCPA settlements approved throughout the nation.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court finally approve the agreed-upon Settlement, find that the agreed-upon attorneys' fees, expenses and incentive award are reasonable, enter the proposed order separately submitted, and award any further relief that the Court deems reasonable and just.

1   Dated: January 25, 2013                    Respectfully Submitted,

2                                              SAMANTHA ELLISON, individually and
3                                              on behalf of a class of similarly situated
                                               individuals,
4

5                                              /s/      Ari J. Scharg
                                               One of Plaintiff's Attorneys
6

7                                              Suzanne Havens Beckman (SBN 188814)
                                               shavens@parisihavens.com
8                                              David C. Parisi
9                                              dcparisi@parisihavens.com
                                               PARISI & HAVENS LLP
10                                             15233 Valleyheart Drive
11                                             Sherman Oaks, CA 91403
                                               Telephone: (818) 990-1299
12                                             Facsimile: (818) 501-7852

13
                                               Ryan D. Andrews (*Pro Hac Vice*)
14                                             randrews@edelson.com
15                                             Ari J. Scharg (*Pro Hac Vice*)
                                               ascharg@edelson.com
16                                             John C. Ochoa (*Pro Hac Vice*)
17                                             jochoa@edelson.com
                                               EDELSON MCGUIRE LLC
18                                             350 North LaSalle, Suite 1300
19                                             Chicago, IL 60654
                                               Telephone: (312) 589-6370
20                                             Facsimile: (312) 589-6378

21

22

23

24

25

26

27

28

1

### CERTIFICATE OF SERVICE

2      **I HEREBY CERTIFY** that I caused to be served the above and foregoing

3   ***Plaintiff's Notice of Motion and Motion for Final Approval of Class Action***

4   ***Settlement*** to all counsel of record via email and the court's CM/ECF system on

5   this, the 25th day of January, 2013.

6

7                              /s/     Ari J. Scharg

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28